[No. A074161. First Dist., Div. Four. Mar. 31, 1997.]

SOUTHERN CALIFORNIA LABOR MANAGEMENT OPERATING ENGINEERS CONTRACT COMPLIANCE COMMITTEE, Plaintiff and Appellant, v.
LLOYD W. AUBRY, JR., as Director, etc., Defendant and Respondent.

874

876

**COUNSEL**

Carroll & Scully, Donald C. Carroll and Charles P. Scully II for Plaintiff and Appellant.

John M. Rea and Gary J. O'Mara for Defendant and Respondent.

## OPINION

**HANLON, J.**—Plaintiff and appellant Southern California Labor Management Operating Engineers Contract Compliance Committee (appellant) appeals from a judgment denying its petition for a peremptory writ of mandate directing defendant and respondent Lloyd W. Aubry, Jr. as Director of the Department of Industrial Relations of the State of California (respondent) to set aside his outstanding decision and issue a new determination that the Seven Oaks Dam project is a public works subject to the California prevailing wage law (Lab. Code, §§ 1771, 1720-1781) (hereinafter referred to as PWL) rather than Davis-Bacon Act, 40 United States Code section 276a(a), which is the federal prevailing wage law (hereinafter referred to as DBA).

Appellant contends: (1) the PWL applies even though the construction contract for the dam project was "awarded" by an agency of the federal government, and (2) respondent acted beyond its power by refusing to enforce a statute on constitutional or preemption grounds. We affirm.

### I. *Statement of Facts*

Seven Oaks Dam project is a part of the Santa Ana River Mainstem, including Santiago Creek, California Flood Control Project. Construction of the complete flood control project is governed by a local cooperation agreement among the Department of the Army, Orange County Flood Control District, San Bernardino County Flood Control District and Riverside County Flood Control and Water Conservation District, which was executed in 1989. As a group the involved counties are denominated as "sponsors."

Relevant provisions of the local cooperation agreement are as follows:

The maximum allowable cost of the flood control project is set at $1,536,000,000. At the time of the execution of the agreement, total costs were estimated at $1,293,000,000 and the sponsors' cash contribution at $63,700,000. In addition, "sponsors shall provide all lands, easments [*sic*], rights-of-way, excavated material disposal areas, and perform relocations (excluding railroad bridges and approaches thereto) required for construction of the [flood control] project." The total contribution of the sponsors cannot exceed 50 percent or be less than 25 percent. During construction the sponsors shall provide a cash contribution of 5 percent of the total cost. No federal funds may be used to meet the sponsors' share, unless expressly authorized by statute. The federal government shall audit the sponsors' records and issue a final accounting which is binding on the sponsors. All funds contributed by the federal government and sponsors shall be placed in

an escrow account. The federal government shall pay the costs of construction from funds in such account.

Basic contractual "obligations of the parties" include the following: A. "The [Federal] Government, subject to and using funds provided by the Sponsors and funds appropriated by the Congress, shall expeditiously construct the [Flood Control] Project (including alterations or relocations of railroad bridges and approaches thereto) applying those procedures usually followed or applied in Federal projects, pursuant to Federal laws, regulations, and policies. The sponsors shall be afforded the opportunity to review and comment on all contracts, including relevant plans, specifications and special provisions prior to the issuance of invitations for bids. The Sponsors also shall be afforded the opportunity to review and comment on all modifications and change orders prior to the issuance to the Contractor of a Notice to Proceed for such modification or change order unless an emergency exists or immediate action is required, in which case the [Federal] Government will direct the change without review by the Sponsors. The [Federal] Government will consider the views of the Sponsors, but award of the contracts including change orders and performance of the work thereunder shall be exclusively within the control of the [Federal] Government."

The term "contracting officer" is defined in the agreement as "the Commander of the U.S. Army Engineer District, Los Angeles, or his designee." Regarding "construction, phasing and management," "[t]he contracting officer shall consider the recommendations of the [sponsors] in all matters relating to the [Flood Control] Project, but the Contracting Officer, having ultimate responsibility for construction of the Project, has complete discretion to accept, reject, or modify the recommendations."

Sponsoring counties shall hold and save the federal government free from all damages "except for damages due to the fault or negligence of the [Federal] Government or its contractors." If hazardous substances are found in the area of the flood control project, the federal government "shall, after consultation with the Local Sponsors, but in its sole discretion, determine" what action to take. The sponsors agree to comply with all applicable federal and state laws and regulations. Some laws are specifically listed, but no mention is made of the California PWL or the federal DBA.

The final relevant provision of the local cooperation agreement is: "When the [Federal] Government determines that a feature or phase of the [Flood Control] Project is complete and appropriate for operation and maintenance by a Sponsor or Sponsors, the [Federal] Government shall turn the completed feature or phase over to the responsible Sponsor or Sponsors . . . ."

Pursuant to the local cooperation agreement, on March 29, 1994, the United States Army Engineer District-Los Angeles entered into a contract with CBPO of America, Inc., for construction of the Seven Oaks Dam and Appurtenances. Total estimated cost for the project was $167,777,000. The contract for the Seven Oaks Dam specifically provides that "laborers and mechanics employed or working upon the site of the work" will be paid in accordance with the DBA.

## II. *Applicability of PWL*

 Appellant contends that the PWL applies even though the construction contract for the Seven Oaks Dam project was "awarded" by an agency of the federal government. This contention lacks merit.

The core of the PWL is Labor Code section 1771[1], which provides in pertinent part: "Except for public works projects of one thousand dollars ($1,000) or less, not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed, and not less than the general prevailing rate of per diem wages for holiday and overtime work fixed as provided in this chapter, shall be paid to all workers on public works." Under PWL respondent determines the general prevailing rate. (§§ 1770, 1773, 1773.6.)

DBA provides in pertinent part: "The advertised specifications for every contract in excess of $2,000, to which the United States or the District of Columbia is a party, for construction . . . of public buildings or public works of the United States or the District of Columbia within the geographical limits of the States of the Union or the District of Columbia, and which requires or involves the employment of mechanics and/or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the city, town, village, or other civil subdivision of the State in which the work is to be performed . . . ." (40 U.S.C. § 276a(a).)

Other California code sections which define when PWL applies are the following.

Section 1720 provides in pertinent part: "As used in this chapter, 'public works' means:

---

[1] Unless otherwise stated all citations to California statutes are to the Labor Code.

"(a) Construction, alteration, demolition, or repair work done under contract and paid for in whole or in part out of public funds, except work done directly by any public utility company pursuant to order of the Public Utilities Commission or other public authority.

"(b) Work done for irrigation, utility, reclamation, and improvement districts, and other districts of this type. 'Public work' shall not include the operation of the irrigation or drainage system of any irrigation or reclamation district, except as used in Section 1778 relating to retaining wages.

"(c) Street, sewer, or other improvement work done under the direction and supervision or by the authority of any officer or public body of the state, or of any political subdivision or district thereof, whether the political subdivision or district operates under a freeholder's charter or not."

Section 1720.2 provides in pertinent part: "For the limited purposes of Article 2 (commencing with Section 1770) of this chapter, 'public works' also means any construction work done under private contract when all of the following conditions exist: [¶] (a) The construction contract is between private persons. [¶] . . . [¶] (c) Either of the following conditions exist: [¶] (1) The lease agreement between the lessor and the state or political subdivision, as lessee, was entered into prior to the construction contract. [¶] (2) The construction work is performed according to plans, specifications, or criteria furnished by the state or political subdivision, and the lease agreement between the lessor and the state or political subdivision, as lessee, is entered into during, or upon completion of, the construction work."

Section 1720.3 provides: "For the limited purposes of Article 2 (commencing with Section 1770), 'public works' also means the hauling of refuse from a public works site to an outside disposal location, with respect to contracts involving any state agency, including the California State University and the University of California." Section 1720.4 covers work on nonprofit installations performed by volunteer labor.

Section 1721 provides: " 'Political subdivision' includes any county, city, district, public housing authority, or public agency of the state, and assessment or improvement districts."

Section 1722 provides: " 'Awarding body' or 'body awarding the contract' means department, board, authority, officer or agent awarding a contract for public work."

Section 1724 provides: " 'Locality in which public work is performed' means the county in which the public work is done in cases in which the

contract is awarded by the State, and means the limits of the political subdivision on whose behalf the contract is awarded in other cases."

Section 1740 provides: "Notwithstanding any other provision of this chapter or any other law of this State, except limitations imposed by the Constitution, the legislative body of a political subdivision which has received or is to receive a loan or grant of funds from the Federal Government or a federal department or agency for public works of that political subdivision, may provide in its call for bids in connection with such public works that all bid specifications and contracts and other procedures in connection with bids or contracts shall be subject to modification to comply with revisions in federal minimum wage schedules without the necessity of republication or duplication of other formal statutory requirements."

Section 1775 provides in pertinent part: "The contractor shall, as a penalty to the state or political subdivision on whose behalf the contract is made or awarded, forfeit not more than fifty dollars ($50) for each calendar day, or portion thereof, for each worker paid less than the prevailing rates as determined by the director for the work or craft in which the worker is employed for any public work done under the contract by him or her or by any subcontractor under him or her."

Section 1777 provides: "Any officer, agent, or representative of the State or of any political subdivision who wilfully violates any provision of this article, and any contractor, or subcontractor, or agent or representative thereof, doing public work who neglects to comply with any provision of section 1776 is guilty of a misdemeanor."

Section 1777.7 provides in pertinent part: "(d) Any funds withheld by the awarding body pursuant to this section shall be deposited in the General Fund if the awarding body is a state entity, or in the equivalent fund of an awarding body if the awarding body is an entity other than the state."

Sections 1779 and 1780 make it a misdemeanor to charge or collect fees with respect to the employment of persons on public works. The state, political subdivisions and contractors are mentioned in the sections; the federal government is not.

■ "A fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law . . . . In construing a statute, our first task is to look to the language of the statute itself. . . . When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute

according to its terms. . . . [¶] . . . 'We are required to give effect to statutes "according to the usual, ordinary import of the language employed in framing them." . . .' . . . ' "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." . . . "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." . . . Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole . . . .' " (*DuBois* v. *Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387-388 [20 Cal.Rptr.2d 523, 853 P.2d 978], citations omitted.)

"[A]n overriding principle in this area is that the individual portions of a statute should be harmonized . . . with the body of law of which it forms a part. [Citations.]" (*United Public Employees* v. *Public Employment Relations Bd.* (1989) 213 Cal.App.3d 1119, 1127 [262 Cal.Rptr. 158].) "The object that a statute seeks to achieve is of primary importance in statutory interpretation. [Citations.]" (*Lusardi Construction Co.* v. *Aubry* (1992) 1 Cal.4th 976, 987 [4 Cal.Rptr.2d 837, 824 P.2d 643].)

 The overall purpose and object of California's PWL "is to benefit and protect employees on public works projects. This general objective subsumes within it a number of specific goals: to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees. [Citations.]" (*Lusardi Construction Co.* v. *Aubry, supra,* 1 Cal.4th at p. 987; *Independent Roofing Contractors* v. *Department of Industrial Relations* (1994) 23 Cal.App.4th 345, 356 [28 Cal.Rptr.2d 550].)

The overall purpose and object of DBA is " 'to protect local wage standards by preventing contractors from basing their bids on wages lower than those prevailing in the area.' [Citation.] . . . [T]he Act was intended to combat the practice of 'certain itinerant, irresponsible contractors, with itinerant, cheap, bootleg labor, [who] have been going around throughout the country "picking" off a contract here and a contract there.' The purpose of the bill was 'simply to give local labor and the local contractor a fair opportunity to participate in this building program.' [Citation.]" (*Universities Research Assn.* v. *Coutu* (1981) 450 U.S. 754, 773-774 [101 S.Ct. 1451, 1463, 67 L.Ed.2d 662].)

 The PWL and DBA each carry out a similar purpose. DBA specifically provides that it only applies to contracts "to which the United

States or the District of Columbia is a party." The PWL does not contain a specific clause limiting it to contracts to which the state of California or a political subdivision thereof is a party. However, the overall effect of the various code sections which constitute the PWL is to exclude contracts of the federal government. Thus, sections 1720, subdivision (c), 1720.2, 1720.3 and 1724 refer to construction jobs under the supervision of state entities while the sections assessing penalties for violating the PWL only mention state entities (§§ 1775, 1777, 1779). No sections, either individually or collectively, mandate that contracts awarded by, or construction jobs under the supervision of, federal authorities are subject to the PWL. In fact, the only mention of the federal government refers to a federal wage law (§ 1740). Read as a unit PWA and DBA set out two separate, but parallel, systems regulating wages on public contracts. The PWL covers state contracts and DBA covers federal contracts.

Respondent has long agreed with this interpretation of the statutes. Section 1773.5 provides: "The Director of Industrial Relations may establish rules and regulations for the purpose of carrying out this chapter, including, but not limited to, the responsibilities and duties of awarding bodies under this chapter."

One such regulation is California Code of Regulations, title 8, section 16001, entitled "Public Works Subject to Prevailing Wage Law," which provides: "Federally Funded or Assisted Projects. The application of state prevailing wage rates when higher is required whenever federally funded or assisted projects are controlled or carried out by California awarding bodies of any sort." (Cal. Code Regs., tit. 8, § 16001, subd. (b).)

Other pertinent regulations are as follows: "Awarding body" is defined as: "Any state or local government agency, department, board, commission, bureau, district, office, authority, political subdivision, regional district officer, employee, or agent awarding/letting a contract/purchase order for public works." (Cal. Code Regs., tit. 8, § 16000.) "Public Funds. Includes state, local and/or federal monies." (Cal. Code Regs., tit. 8, § 16000.) "General Coverage. State prevailing wage rates apply to all public works contracts as set forth in Labor Code Sections 1720, 1720.2, 1720.3, 1720.4, and 1771." (Cal. Code Regs., tit. 8, § 16001, subd. (a).)

Thus under the regulations, federally funded projects controlled by, carried out by, and awarded by the federal government are not subject to PWL, even if it requires a higher wage than DBA. Nothing in the two administrative cases of respondent, cited by appellant, contradicts the regulations because neither case involved the federal government. (Public Works

Coverage Case No. 91-056, Southern Cal. Regional Rail Authority Lease of Union Pacific Right-of-Way, Decision on Appeal, Nov. 30, 1993 and Public Works Case No. 96-006, Department of Corrections, Community Correctional Facilities, June 11, 1996.)

■ An agency's regulation "will not be set aside unless it is inconsistent with the statute, arbitrary, capricious, unlawful or contrary to public policy. [Citation.]" (*Pipe Trades Dist. Council No. 51* v. *Aubry* (1996) 41 Cal.App.4th 1457, 1466 [49 Cal.Rptr.2d 208].) An agency's "construction of statutes will generally be followed unless it is clearly erroneous. [Citation.]" (*United Public Employees* v. *Public Employment Relations Bd.*, *supra*, 213 Cal.App.3d at p. 1125.)

■ To determine if respondent's regulations are valid interpretations of the statutes, we look to cases construing the PWL, DBA and related statutes, particularly those which involve the question of preemption by federallaw. ■ "[T]he Supremacy Clause, U.S. Const., Art. VI, may entail pre-emption of state law either by express provision, by implication, or by a conflict between federal and state law. [Citations.] And yet, despite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law. [Citation.]" (*New York Blue Cross* v. *Travelers Ins.* (1995) 514 U.S. 645, __ [115 S.Ct. 1671, 1676, 131 L.Ed.2d 695, 704]; see also *Greater Westchester Homeowners Assn.* v. *City of Los Angeles* (1979) 26 Cal.3d 86, 93-94 [160 Cal.Rptr. 733, 603 P.2d 1329].)

"Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' [citation] . . . ." (*Hillsborough County* v. *Automated Medical Labs.* (1985) 471 U.S. 707, 713 [105 S.Ct. 2371, 2375, 85 L.Ed.2d 714].) Further, ". . . there are situations in which state regulation, although harmonious with federal regulation, must nevertheless be invalidated under the Supremacy Clause." (*De Canas* v. *Bica* (1976) 424 U.S. 351, 356 [96 S.Ct. 933, 937, 47 L.Ed.2d 43].)

In *Commissioner of Labor and Ind.* v. *Boston Housing Auth.* (1963) 345 Mass. 406 [188 N.E.2d 150, 157-158], the highest court in Massachusetts held that under the rules of preemption a federal agency operating a housing project in Boston pursuant to federal regulations was not subject to a state prevailing wage law. Thus, in order to avoid a serious constitutional problem it interpreted the state law as not intended by the Legislature to require

action by the federal agency in conflict with proper explicit budgetary requirements of a federal law. The court reasoned, "The intention to coerce such a head on conflict with Federal authority is not lightly to be attributed to the Legislature, which must be taken to have known the existing law relating to housing projects receiving [federal] contributions."

*Gartrell Const. Inc.* v. *Aubry* (9th Cir. 1991) 940 F.2d 437, 438-439 [131 A.L.R.Fed. 773] held that a private contractor performing work for the federal government on federal property was not required to obtain a California contractor's license, because he complied with the parallel federal "responsibility" regulations for contractors. The state law was preempted by the "similar" federal requirements. To same effect see *Airport Const. and Materials, Inc.* v. *Bivens* (1983) 279 Ark. 161 [649 S.W.2d 830, 832].

*California Comm'n* v. *United States* (1958) 355 U.S. 534, 540, 545-546 [78 S.Ct. 446, 450-451, 453-454, 2 L.Ed.2d 470], held that California statutes and regulations regarding rates for shipping freight could not be applied to federal procurement officials because "Congress has provided a comprehensive policy governing procurement." (*Id.* at p. 540.) In reaching its holding the nation's highest court quickly distinguished certain types of state laws. "We lay to one side these cases which sustain nondiscriminatory state taxes on activities of contractors and others who do business for the United States, as their impact at most is to increase the costs of the operation. [Citations.] We also need do no more than mention cases where, absent a conflicting federal regulation, a State seeks to impose safety or other requirements on a contractor who does business for the United States." (*Id.* at p. 543 [78 S.Ct. at p. 452].) ■ Minimum wage laws fall under the same classification as valid regulation of the employment relationship under state police powers. (*De Canas* v. *Bica, supra,* 424 U.S. at pp. 356-357 [96 S.Ct. at pp. 936-937].) The PWL is not a minimum wage law, however. (*San Francisco Labor Council* v. *Regents of University of California* (1980) 26 Cal.3d 785, 790 [163 Cal.Rptr. 460, 608 P.2d 277]).

■ *Hull* v. *Dutton* (11th Cir. 1991) 935 F.2d 1194, 1196-1198, held that a state agency which ran a switching railroad as a private carrier was subject to the Railway Labor Act and such federal law preempted a state law establishing bonus payments for certain state employees.

*Chamber of Commerce of U.S.* v. *Bragdon* (9th Cir. 1995) 64 F.3d 497, 504 held that the National Labor Relations Act preempted a Contra Costa County ordinance which established a prevailing wage law for "wholly private construction projects." In contrast, *People* v. *Hwang* (1994) 25 Cal.App.4th 1168, 1172, 1181-1182 [31 Cal.Rptr.2d 61], held that PWL was not preempted by the National Labor Relations Act as to a public works contract between a private contractor and county school district.

*Drake* v. *Molvik & Olsen Elec., Inc.* (1986) 107 Wn.2d 26 [726 P.2d 1238], held that the Washington prevailing wage law governed a "federally-funded construction project by the Seattle Housing Authority" and was not preempted by DBA. (To same effect see *Siuslaw Concrete Const.* v. *Wash., Dept. of Transp.* (9th Cir. 1986) 784 F.2d 952, 953-954, 959 [involving a state-run training program which might be exempt under the provision of DBA].)

*Metropolitan Water Dist.* v. *Whitsett* (1932) 215 Cal. 400, 408, 417 [10 P.2d 751] upheld the constitutionality of PWL, in part "on the theory that the state as the employer having full control of the terms and conditions under which it will contract may, through its legislatures, and within constitutional limits, provide the wage which shall be paid to its employees and that the payment of a less sum shall be unlawful." Overall, the state has greater power to legislate in areas covered by federal law as "proprietor" than as "regulator." (*Building & Constr. Trades Council* v. *Associated Builders & Contractors of Mass./R.I., Inc.* (1993) 507 U.S. 218, 226-227, 232-233 [113 S.Ct. 1190, 1195-1196, 1198-1199, 122 L.Ed.2d 565].)

The basic distinction uniformly maintained in the cases is that state-enacted prevailing wage regulations are valid and not preempted by federal law when applied to contracts of the state or its political subdivisions. However, those laws cannot be applied to a project which is under the complete control of the federal government. This is also the distinction made by respondent's regulations, which provide that the PWL rather than DBA is applied to federally funded or assisted construction projects in California when wages under PWL would be higher and the projects "are controlled or carried out by California awarding bodies of any sort." Accordingly, because the regulations are consistent with California cases, federal cases, cases from other states, and the PWL statutes, we will follow them.

In the present case, the awarding body is an agency of the federal government. The local cooperation agreement governs the overall project containing the Seven Oaks Dam project at issue herein. Under the local cooperation agreement, the federal agency is given the ultimate authority over the actual construction, financial audits, paying the construction companies, determination of what to do if hazardous substances are discovered and determination that a project is complete. Thus, the Seven Oaks Dam project is controlled and carried out by a federal awarding body and under respondent's regulations, the PWL does not apply.

Appellant expresses the fear that a decision for respondent "would positively invite California public bodies in the future to give California public

monies to the Corps of Engineers (or to any private party if the trial court is correct) and to let it award all contracts, thereby allowing such public bodies and employers to evade the PWL." We wish to calm appellant's fears. This court shares the Legislature's interest in protecting working people in the state. Our decision is based on a careful scrutiny of the record to discover the actual relationship between federal, state and private parties. We do nothing more than uphold the regulations and apply the facts to the regulations and statute. As in other areas of the law, each case involving public contracts and PWL will be decided on its own facts and merits.

### III. *Respondent's Administrative Decision*

■ Appellant contends that respondent director violated the California Constitution by "refusing to find a public works to exist simply because of a perceived fear of unconstitutionality or conflict with federal law." This contention lacks merit.

California Constitution, article III, section 3.5 provides that an administrative agency has no power to refuse to enforce a statute on the grounds it is unconstitutional or conflicts with federal law, until an appellate court has so held. In *Reese* v. *Kizer* (1988) 46 Cal.3d 996, 1002 [251 Cal.Rptr. 299, 760 P.2d 495], the Supreme Court held: "The purpose of the amendment was to prevent agencies from using their own interpretation of the Constitution or federal law to thwart the mandates of the Legislature. Its language, however, cannot reasonably be construed to place a restriction on the authority of the Legislature to limit the scope of its own enactments. By limiting the implementation of a statute as directed by the Legislature, an agency neither 'declares it unenforceable' nor 'refuses to enforce it.' Indeed, far from thwarting the Legislature's mandate, such action precisely fulfills it." (Fns. omitted.)

Respondent's administrative decisions in the instant case were proper interpretations of the PWL within the scope of *Reese*.

### IV. *Disposition*

The judgment is affirmed. Costs are awarded to respondent.

Anderson, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied April 29, 1997, and appellant's petition for review by the Supreme Court was denied July 9, 1997.